**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST
VIRGINIA HIGHLANDS
CONSERVANCY, INC.,

                Plaintiffs,

v.                                        CIVIL  ACTION  NO.  3:07-0413

APOGEE COAL COMPANY, LLC, and
HOBET MINING, LLC,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

       Pending before this Court is Defendant's Motion to Dismiss (Doc. 24) and a Supplemental

Motion to Dismiss Hobet Mining, LLC for Lack of Subject Matter Jurisdiction (Doc. 38).   A

hearing was held on these motions, January 7, 2007.  For the reasons explained below, the Motion

to Dismiss (Doc. 24) is **DENIED**; the Supplemental Motion to Dismiss (Doc 38) is **DENIED**

**without prejudice**.

**Factual and Procedural Background**

       Plaintiffs brought suit alleging the illegal discharge of selenium from mining operations

owned by defendants Apogee Coal Company (Apogee) and Hobet Mining (Hobet) – both

subsidiares of Magnum Coal Company.  Selenium is a naturally occurring element, commonly found

in the environment.   It becomes a problem only when it is present in high concentrations.  Excess

selenium can harm the environment as it affects the reproductive cycle of aquatic species and may

eventually damage gills and other organs.

Both the U.S. Environmental Protection Agency (EPA) and the West Virginia Department of Environmental Protection (DEP) have recognized the potentially harmful effects of selenium for some time. EPA promulgated the first water quality criterion for selenium in 1987– 5 micrograms per liter of water (5 µg/l) – a criterion subsequently adopted by DEP. This criterion is the allowable in-stream concentration of selenium, but is not itself a specific limit on individual dischargers of the pollutant. In 2003, a draft Programmatic Environmental Impact Statement on Mountaintop Removal Mining showed that mining operations in West Virginia could lead to a violation of the 5 µg/l standard.[1] DEP's 2004 list of impaired streams recognized that some waters were, in fact, impaired because of selenium. As a result of the increased awareness of selenium problems in West Virginia, DEP began to include selenium limits in permits to individual dischargers whose effluent has a reasonable potential to lead to selenium levels above the instream criterion.[2]

Both Apogee and Hobet hold permits regulating the discharge of selenium from their mine-sites. Plaintiffs contend that Defendants have each exceeded the selenium limits in their respective permits – WV1013599 for Apogee and WV1017225 for Hobet. Plaintiffs allege violations of both the federal Clean Water Act (CWA) and the federal Surface Mining Control and Reclamation Act

---

[1]Certain mining activities expose selenium-bearing soil and rock to weathering processes. As a result, runoff from mining operations may contain higher levels of selenium than would be present if mining was not taking place. This runoff may in turn increase selenium levels in waterways downstream from the mine.

[2]Mine runoff is regulated under the National Permit Discharge Elimination System (NPDES) because it is considered a point source under the Clean Water Act. Naturally occurring surface water is channeled into sediment control ponds, designed to remove sediment and other pollutants. Water flows out of these sediment ponds at discrete points, referred to as "outfalls," and is subject to limitations specified in individual permits. In West Virginia these permits are issued by the DEP.

(SMCRA).  The backgrounds of the two permits are different and must be discussed individually.

**Apogee Coal Company Permit WV1013599**

On August 8, 2006 the DEP issued a renewal of permit WV1013599 to the predecessor of Apogee Coal; this permit was transferred to Apogee on September 12, 2006.  Permit WV1013599 places limits on the amount of selenium the permit holder can discharge into five distinct tributaries of the Guyandotte River.  Limits on the discharge of selenium were effective the date of issuance. Apogee's monthly average discharge was limited to 4.7 µg/l, and the daily maximum discharge to 8.2 µg/l.  Plaintiffs contend that the discharge monitoring reports (DMR's) submitted by Apogee to DEP show violations of monthly average discharges.  By Plaintiffs' count, Apogee violated the conditions of its permit 376 times between September 1, 2006 and December 31, 2006 (a violation of a monthly limit is considered a violation on each day of that month).

On January 31, 2007, DEP issued Apogee a compliance order which stated, " [y]our permit is hereby modified to extend the compliance deadline for your final selenium effluent limitations for three (3) years from the effective date of this Order for outlets in Attachment A."  (Mem. in Supp. of Def. Mot. To Dismiss Ex. A at 2).  Essentially, this compliance order sought to reinstate "monitor and report only requirements" – without specific limitations – that had been in place before the August 8, 2006 permit.  Plaintiffs contend that this compliance order was not issued in accordance with the  procedural requirements necessary to modify the permit.  Specifically, they argue that the compliance order was issued without any public notice and therefore without any chance for the public to participate in the permitting process.  As a result of this failure of notice, Plaintiffs argue that the  attempted January 31 modification was ineffective and that the permit reissued on August 8, 2006 legally controls.  Plaintiffs issued a Notice of Intent to sue (NOI) Apogee

for violations of the CWA and SMCRA on March 22, 2007.   According to Plaintiffs, Apogee continues to exceed the selenium limits specified in the August 8th permit.

### Hobet Mining's Permit WV1017225

On January 20, 2004, DEP issued a renewal of permit WV1017225 to the predecessor of Defendant Hobet Mining Co.  The permit contained selenium limits that were to go into effect January 21, 2007, after a three year period under which Hobet was to prepare for the new limitations.  Permit WV1017225 targeted discharges into various tributaries to the Mud River (which  is itself a tributary of the Guyandotte.)  The selenium limitations established in Hobet's permit were 4.7 $\mu$g/l for daily average and 8.2 $\mu$g/l for monthly average.  According to Plaintiffs' count, Hobet violated these limits at least 42 times between January 21, 2007 and March 31, 2007.  Plaintiffs issued a NOI for these violations on March 2, 2007.

On April 5, 2007, DEP issued a compliance order to Hobet which stated, "[y]our permit is hereby modified to extend the compliance deadline for your final selenium effluent limitation for three (3) years from the effective date of this Order for those outlets in Attachment A."  (Mem. in Supp. of Def. Mot. To Dismiss Ex. B at 13). Again, this compliance order was intended to reinstate monitor and report only requirements for selenium that had been in effect before the January 21, 2007 limits.

Plaintiffs argue that this compliance order, too, was issued without proper regard for administrative procedure.  Specifically, they argue that although DEP gave some public notice, the notice was insufficient under the law.  They contend that the compliance order was ineffective and that the January 21, 2007 limits remain applicable.  Hobet continues to exceed these limitations.

In a supplement to their motion to dismiss, Defendants make a factual allegation which they

contend eliminates this Court's subject matter jurisdiction over the case. According to Defendants, only outlets 1 and 2 of permit WV1017225 were ever subject to selenium effluent limitations (other outlets retained an obligation only to monitor and report). Outlets 1 and 2 were transferred to another Hobet surface mine, subject to a different NPDES permit. This transfer was through a "minor modification" as a result of Hobet's completion of mining and reclamation at the first permitted mine site. Defendants further claim that the new permit covering outlets 1 and 2 is the subject of a DEP enforcement action in Boone County, West Virginia.

For their part, Plaintiffs contend that the minor modification used to transfer outlets 1 and 2 to a different permit was illegal and ineffective. Consequently, they claim that outlets 1 and 2 should still be considered part of permit WV1017225 and part of the present lawsuit.

### Action Before the West Virginia State Environmental Quality Board

The compliance order DEP issued to Hobet on April 5, 2007 was one of over 80 identical orders that DEP issued that day to coal operators holding permits with selenium effluent limits. Each of these orders purported to suspend selenium limits for the relevant permittee. The plaintiffs from this case (joined by one additional plaintiff) challenged 80 of those orders, through state-administrative channels, by filing appeals with the West Virginia Environmental Quality Board (EQB). Plaintiffs represent to this Court that none of the orders appealed to the EQB were issued to Hobet and two orders distinct from that pertaining to this case were issued to Apogee. None of the EQB-appealed orders had effective selenium limits before the compliance orders were issued; there were no permit violations before the other orders were issued. The EQB conducted a hearing on 14 of the appealed orders on November 20, 2007 and stayed the appeal of 57 other orders. The EQB has not, however, resolved these claims on the merits.

## Discussion

Plaintiffs' complaint contains four counts upon which relief is requested. Count One complains of CWA Violations related to Apogee's WV1013599 permit. Count Two complains of SMCRA violations related to this same Apogee permit. Count Three complains of CWA violations of Hobet's WV1017225 permit. Count Four complains of SMCRA violations related to this same Hobet permit.

Defendants raise numerous defenses to the counts alleged by Plaintiffs. The first set of defenses are brought in a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Defendants bring up six issues regarding Plaintiffs' failure to state a claim under the CWA:  1) Plaintiffs have failed to exhaust administrative remedies; 2) Plaintiffs cannot state a claim because final effluent limitations are no longer in effect; 3) Plaintiffs' claims are not ripe for adjudication; 4) the Court should decline to exercise jurisdiction under the *Burford* abstention doctrine; 5) the Court should stay the case pursuant to the primary jurisdiction doctrine; and finally, 6) Plaintiffs are estopped from claiming that orders extending Defendants' permits are invalid because the position is inconsistent with the position taken by Plaintiffs in front of the EQB. In defense of Plaintiffs' SMCRA claims, Defendants  argue that the claim is barred by the reasoning of the Fourth Circuit Court of Appeals in *Bragg v. W.Va. Coal Ass'n.,* 248 F.3d 275 (4th Cir. 2001).

Defendants also assert a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, which pertains only to Hobet's permit. This defense was brought up on a supplement to their original motion to dismiss, and must be decided under a different standard of review. In their supplemental motion, Defendants argue that the Court does not have jurisdiction under the citizen-suit provision of the CWA: first, because all allegations pertaining to Hobet are past violations

insufficient to grant jurisdiction; second, because the DEP is prosecuting an action in the Circuit Court of Boone County, West Virginia against Hobet, which precludes the citizen suit here.

This opinion will first address Defendants' motion to dismiss for failure to state a claim. It will then proceed to address the supplemental motion to dismiss for lack of subject matter jurisdiction.

## I. Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted

In reviewing Defendants' motion to dismiss, this Court will consider factual allegations in the light most favorable to Plaintiffs. *See Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991). Under Federal Rule of Civil Procedure 8(a) a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (internal quotations and ellipses omitted). A well-pled complaint may proceed even if it appears to the trial judge that proof of the alleged facts "is improbable, and that a recovery is very remote and unlikely." *Id.* at 1965 (internal citation omitted). Factual allegations in a complaint, however, must be enough "to raise a right to relief above the speculative level." *Id.* In *Twombly*, the U.S. Supreme Court pointed out that the "no set of facts" language from *Conley v. Gibson* had been frequently misconstrued so that motions to dismiss would fail unless the complaint demonstrated upon its face that the claim would be impossible to prove factually. *Id.* at 1968 (citing *Conley* 355 U.S. 41, 45-46 (1957)). Rather than stating the minimum standard of pleading necessary to govern the complaint's survival, the *Conley* "no set of facts" language simply "described the breadth of opportunity to prove what an adequate complaint claims." *Id.* at 1969. The *Twombly* Court was careful to explain that it was not creating

a heightened standard for the pleading of specific facts, rather it clarified that a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

A.  *The Plaintiffs Have Sufficiently Stated A Claim Under the Clean Water Act*

"The main purpose of the CWA is to 'restore and maintain the chemical, physical, and biological integrity of the nations waters' by reducing and eventually eliminating, the discharge of pollutants into these waters." *Natural Res. Def. Council, Inc. v. U.S. EPA* 16 F.3d 1395, 1399 (4th Cir. 1993) (citing 33 U.S.C. § 1251(a)).  To achieve these goals, the CWA contains a general prohibition on the "discharge of any pollutant," with certain statutorily defined exceptions.  33 U.S.C. § 1311.  One of these exceptions is through compliance with a NPDES permit.  33 U.S.C. § 1342.  NPDES permits are issued either directly by the U.S. EPA or by a state which was been granted primacy status to administer its own NPDES program.   West Virginia has been granted authority to administer its own NPDES program, and permits in this state are issued by the DEP. *See* W. Va. Code § 22-11-4(a)(1), 47 C.S.R. § 10.3 (2005).

The CWA contains a citizen suit provision, which grants federal jurisdiction over civil enforcement actions if stated conditions are met.  33 U.S.C. § 1365.  The citizen suit provision states, in relevant part, "any citizen may commence a civil action on his own behalf – (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to a standard or limitation." *Id.*

Defendants characterize Plaintiffs' claims under the CWA not as a traditional citizen suit, but as an impermissible collateral attack on permitting decisions of the DEP.  This characterization relies on the fact that in order to prove their claims, Plaintiffs must show that the attempted permit

modifications by DEP (the compliance orders) are invalid.[3] Defendants argue that the compliance orders given to Hobet, Apogee, and other operators were part of a DEP strategy that allowed the agency to comprehensively review and consider selenium standards.  As Defendants put it, "[DEP's] goal, then, is not to give the permitees extra time to comply with settled limits that have a permanent legal effect; rather, it is to provide the government sufficient time to establish limits that are based on sound science and that protect the uses of the streams that receive the discharges."  Def.'s Mem. of Supp. at 17. Defendants point out that Plaintiffs are concurrently attacking the modification of selenium discharge permits before the state EQB, and argue that the action before this Court threatens to interfere both with state administrative processes and the consideration of comprehensive state policy.

For their part, Plaintiffs contend that the case is a straightforward enforcement action brought against polluters for violations of their permit conditions under 33 U.S.C. § 1365.  Although Plaintiffs recognize that the DEP did attempt to modify these permits, they argue that the modifications were invalid and, consequently, the prior permit limits remain effective.  In their view, the attempted permit modifications do not change the nature of the suit as an enforcement action against polluters.

Determining the characterization of Plaintiffs' CWA claims is essential to the proper resolution of the instant motion.  If indeed Plaintiffs are collaterally attacking an agency permitting decision, the Court should dismiss the claims. On the other hand, if Plaintiffs are pursuing a traditional citizen suit enforcement action, the defenses raised become inapposite and the claims

---

[3] If Plaintiffs are unable to make this showing, their claims would relate only to wholly past violations and create a situation where the Court would dismiss for lack of jurisdiction under the CWA.  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc.*, 484 U.S. 49 (1987).

should proceed.  Because the initial characterization of the claim is so important it will be resolved before addressing specific legal defenses.

Plaintiffs' briefs reference a number of cases in which citizen suits were allowed to proceed despite the state regulatory authority's attempt to modify the underlying permit.   In *U.S. v. Smithfield Foods, Inc.*, for example, the Fourth Circuit Court of Appeals held that special orders did not take precedence over validly issued permits.  191 F.3d 516, 524, 526 (4th Cir. 1999).  The court agreed with the district court's reasoning that the orders could not modify the permit because Smithfield "did not follow the procedures required for the modification of a permit, and none of the Board's Special Orders and letters were issued in accordance with the permit modification procedures." *Id.* at 524 (quoting *U.S. v. Smithfield Foods*, 965 F.Supp. 769, 787-88 (E.D. Va. 1997) (district court opinion)).

Other circuit courts of appeal similarly have held that a citizen suit may proceed on the terms of an original permit if an attempt to modify does not comply with the necessary procedures.  *See Proffitt v. Rohm & Haas,* 850 F.2d 1007 (3d Cir. 1988); *Citizens for a Better Environment – California v. Union Oil Co. of California*, 83 F.3d 1111 (9th Cir. 1996) ("*Union Oil*").  In *Proffitt,* the defendants had entered a stipulation with the EPA staying enforcement of violations on certain permit conditions; this stipulation was incorporated later when the agency attempted to modify the permit. 850 F.2d at 1009-11.  The court held that the amendment was not effective because there was "no opportunity for public participation" and the applicable regulations did not "permit dispensing with public notice when an amendment effects a substantial change in the terms of a permit."  *Id.* at 1012.   In *Union Oil*, citizen-plaintiffs sued for selenium discharges in excess of permit limitations, even though the discharger had reached a settlement agreement that relieved them from

meeting final effluent limitations until a later date.  83 F.3d at 1113-15.  The court refused to

characterize the action as an attack on the agreement rather than a traditional citizen suit for

enforcement of permit conditions.  *Id.* at 1119.  It noted that proper modification procedures

(specifically public notice provisions) had not been met, and held the settlement ineffective to

modify the terms of the permit.  *Id.* at 1120.

For their part Defendants cite heavily from the recently decided case of *Jamison v. Longview

Power, L.L.C.* to support their contention that the DEP is making an important state policy

determination that this Court should not interrupt.  In *Jamison,* a citizen-plaintiff attempted to sue

a power company for alleged violations of its permits.  493 F.Supp.2d 786, 787 (N.D. W.Va. 2007).

The challenge required that the plaintiffs show that the state permitting authority had incorrectly

determined the date on which the permit was issued.  *Id.*  The *Jamison* court considered the

permitting decision an important matter of local public concern, and determined that it should

abstain from the case under the *Burford* abstention doctrine.  *Id.* at 792.  It characterized the

plaintiff's attack as nothing more than a collateral attack on an agency permitting decision.  *Id.* at

787.  Critical to the decision was the fact that an adequate state court remedy was available.  *Id.* at

792.

Having considered the parties' positions, the Court finds that Plaintiffs' CWA claims against

both Apogee and Hobet are better characterized as traditional citizen suit enforcement actions than

collateral attacks, though for different reasons for each permit.  In the case of the Apogee permit,

there was no public notice and Plaintiffs' ability to challenge the modification through state

-11-

administrative channels was effectively eliminated.[4]  State court review is unavailable as the West

Virginia Water Pollution Control Act – the state version of the federal CWA – does not have a

citizen suit provision.  W.Va. Code § 22-11-1 *et seq*.  In its decision to abstain, the *Jamison* court

looked closely at the available state remedies, and found adequate avenues for a direct challenge to

a permit. *Id*. at 792.  No such avenue was available for challenging the Apogee permit.

In the case of Hobet's permit, Plaintiffs had initiated the citizen suit process by filing a notice

of intent to sue before DEP issued a compliance order.  (Plaintiffs had not filed their complaint

because the statutory sixty-day waiting period had not expired.  *See* 33 U.S.C. 1365(b)).  The citizen

suit could not have been a collateral challenge to an order that was not yet issued.  Further, Plaintiffs

again raise the argument that DEP did not comply with public notice procedures.   Although these

particular plaintiffs were probably aware of the permit modification, it would be inconsistent to bar

their citizen suit because of actual knowledge, while recognizing that a different citizen-plaintiff

could proceed on identical claims.  If non-compliance with modification procedures makes an

attempted permit change inapplicable, it should be inapplicable across the board.

Comparing this action to the one before the EQB reveals differences that make it unlikely

that the present suit is a collateral attack on DEP's permitting decisions.   The plaintiffs have raised

seven grounds challenging the permits before the EQB.  Here they rely principally on the defective

public notice (although they did make reference to an anti-backsliding issue during oral argument).

The main issue before the EQB is also of a different nature.  None of the permits in that proceeding

ever had selenium limitations that had gone into effect, and consequently no violations of selenium

---

[4] Under W.Va. Code § 22B-1-7 an appeal of a permitting decision must be made to the EQB
"within thirty days after the date upon which service was complete."  W.Va. Code § 22B-1-7(c).

limitations had occurred.  Here, the subject of Plaintiffs' complaint is  precisely the violation of selenium limits contained within Apogee and Hobet's respective NPDES permits.

Finally, the plaintiff is the master of the complaint.  The plaintiff has the control over who to sue and what claims are brought.  *See Lincoln Property Co. v. Roche*, 546 U.S. 81, 91 (2005) ("In general, the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue, subject only to the rules of joinder of necessary parties"); *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.* 535 U.S. 826, 831 (2002) (The well pled complaint rule allows the plaintiff to maintain suit in state court by allowing him to eschew federal claims.). Plaintiff has not alleged any claims directly against the state or any state representatives in this case. The issue regarding the validity of the permit modifications arises only because Defendants have brought them up as a defense. Having concluded that the CWA claims are best characterized as a traditional citizen suit, the following sections address individual defenses – most of which depend upon the alternative characterization (the exception being collateral estoppel).

### 1.  There is No Need for the Plaintiffs' To Exhaust Administrative Remedies

Requiring a plaintiff to exhaust administrative remedies before bringing suit in federal court "allows the administrative agency to act within the sphere of its special competence, to apply its expertise, and to correct its own errors, and it creates a reasonable division of labor between agency and court."  *Mullins Coal Co. v. Clark,* 759 F.2d 1142, 1145 (4th Cir. 1985).  The exhaustion of remedies doctrine also serves to promote efficiency and aid management of the judicial docket.  *See id.*  The CWA, however, has established its own mechanism allowing an agency to act, and confers federal jurisdiction only if specified conditions are met.   Under 33 U.S.C. § 1365(b), a citizen normally may not sue for sixty days after giving notice of the alleged violation to the EPA

-13-

administrator, the state, and the alleged violator him or herself.  Courts have held that under this notice period, "the district courts should defer to administrative action for sixty days, and at that point determine whether or not the violation has been halted by administrative action or otherwise. If it has not been so halted, the citizen's suit goes forward."  *Am. Canoe Ass'n, Inc. v. U.S. EPA*, 30 F.Supp.2d 908, 922 n. 16  (E.D. Va. 1998) (quoting *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 244 (3d Cir. 1980)).

As discussed above, the Court is satisfied that Plaintiffs' claims are nothing more than a traditional citizen suit enforcement action falling under 33 U.S.C. § 1365.  Plaintiffs complied with the sixty-day notice period, allowing it to expire before filing their complaint with this Court.  They amended their complaint once to eliminate permits subject to a DEP enforcement action in the Circuit Court of Boone County, West Virginia.  *Compare,* Pl. Compl. *with* Pl. First Amended Compl. For Decl. and Injunctive Relief and For Civil Penalties.  They complied with all of the statutory requirements contained within the CWA's citizen suit provision and do not need to exhaust administrative remedies before federal jurisdiction is proper.

Additionally, the Fourth Circuit made clear that cases will not be dismissed for lack of exhaustion when no administrative remedy is available.  *See, e.g. Mullins Coal Co.,* 759 F.2d at 1145.  Here, Plaintiffs argue that DEP's compliance orders were issued without regard to public notice requirements – a situation which impaired their ability to pursue administrative remedies. Plaintiffs should not be bound to administrative channels when the agency itself forecloses a citizen-plaintiff's ability to pursue such channels.

2.   DEP's Compliance Orders Are Not A Bar to Plaintiffs' CWA Claims

Defendants attempt to use the DEP's compliance orders as a bar to Plaintiffs' CWA claims. For legal support, they cite the case of *Piney Run Pres. Ass'n v. County Comm'rs*, which established "permit shield" protection in the Fourth Circuit.  268 F.3d 255 (4th Cir. 2001) ("*Piney Run*").  Under the permit shield doctrine, an NPDES permit shields its holder from liability as long as "(1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not within the reasonable contemplation of the permitting authority at the time the permit was granted."  *Id.* at 259.

This *Piney Run* test does not indicate which "express terms" must be met when there is a question of which form of a permit is applicable.  As previously discussed, a number of circuit courts of appeal – including the Fourth – have determined that a citizen suit may be brought on the terms of an original permit despite an attempted modification; such a claim is not a collateral attack on the modification.  *See U.S. v. Smithfield Foods,* 191 F.3d 516, 524, 526 (4th Cir. 1999); *see also, Proffitt v. Rohm & Haas,* 850 F.2d 1007 (3d Cir. 1988); *Citizens for a Better Environment – California v. Union Oil Co. of California*, 83 F.3d 1111 (9th Cir. 1996) ("*Union Oil*").  Here, Plaintiffs base their complaint on the express terms of the unmodified permits.  Because the compliance orders, if found to be invalid, are ineffective to modify the underlying permit, the permit shield doctrine is inapplicable at this point.

3.   The Case is Ripe for Adjudication

Defendants contend that this case is not ripe for adjudication because it will entangle the Court is abstract disagreements over agency policy and interfere in the agency's decision-making

process.  Defendants argue that there are complicated matters of state policy in this case and that the ripeness doctrine should preclude suit because "the issues to be considered are by no stretch of the imagination purely legal issues."  Def. Reply at 8.

The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Pac. Gas and Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 200-01 (1983) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49 (1967)).   A claim is not ripe for adjudication if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. U.S.,* 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580-81 (1985) (internal quotation marks omitted)).  "Determining whether administrative action is ripe for judicial review requires [a court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003) (citing *Abbott Laboratories*, 387 U.S. at 149).

The present case is ripe for resolution.  All of the administrative actions directly relevant to the permits in question have been formalized and their effects have been felt in a concrete way.  DEP's actions are complete and are not being considered in alternate fora.  Both the original permits and compliance orders have been finalized by the agency.  Although the EQB is considering an appeal of similar orders, neither of the permits at issue is before that tribunal.  As the issues are clear and the facts concrete, the first prong of the *Abbott Labs* test is satisfied.  Because the matters at

-16-

hand are unlikely to become more clear with time, Plaintiffs would suffer a hardship in delayed resolution of their claims. Defendants will suffer no substantial burden by early adjudication.

4. The *Burford* Abstention Doctrine is Inapplicable to the Present Case

The *Burford* Abstention Doctrine was created to "reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth working of the federal judiciary." *Burford v. Sun Oil Co.,* 319 U.S. 315, 332 (1943) (internal quotations omitted). The doctrine was established by the U.S. Supreme Court in a case concerning oil and gas regulation in Texas. The State of Texas had enacted a comprehensive regulatory scheme to ensure the conservation of these resources that essentially conscripted the state court system. *Burford,* 319 U.S. 325-26 ("In describing the relation of the Texas court to the [regulatory] Commission no useful purpose will be served by attempting to label the court's position as legislative . . . suffice it to say that Texas courts are working partners with the Railroad Commission in the business of creating a regulatory system for the oil industry.") The Court considered abstention appropriate because state courts were so closely integrated into the scheme and inconsistent decisions by federal courts threatened its administration. *Id.* at 326-27.

In a more recent case, the Supreme Court made clear that federal courts should not abstain from cases simply because a "there is a potential for conflict with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 362 (1989) (*"NOSPI"*) (internal quotations omitted). The Court then articulated the current test for determining whether a court should abstain under *Burford*:

> Where timely and adequate state-court review is
> available, a federal court sitting in equity must decline

-17-

> to interfere with the proceedings or orders of state
> administrative agencies: (1) when there are "difficult
> questions of state law bearing on policy problems of
> substantial public import whose importance transcends
> the result in the case then at bar"; or (2) where the
> "exercise of federal review of the question in a case
> and in similar cases would be disruptive of state efforts
> to establish a coherent policy with respect to a matter
> of substantial public concern."

*Id.* at 361 (quoting *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 814 (1976)).

The Fourth Circuit Court of Appeals first applied the *Burford* abstention doctrine to an environmental case in *Palumbo v. Waste Tech. Indus.* 989 F.2d 156 (4th Cir. 1993). There, the State of West Virginia opposed the construction of a hazardous waster incinerator proposed in Ohio. The state attempted to challenge the permits directly, through various administrative channels as well as through the Ohio state court system. *Id.* at 157-59. After failing, the state filed in federal court under the citizen suit provisions of RCRA. *Id.* The court determined that "plaintiffs' complaint is nothing more than a collateral attack on the prior permitting decisions of the federal EPA." *Id.* at 158. The court further noted the plaintiffs' complaint did not contain any allegations of non-compliance at the time of the lawsuit. *Id.* at 160.

While this Court recognizes that the DEP is trying to develop a comprehensive and uniform policy for addressing selenium discharges, the *Burford* abstention doctrine is not appropriate. First, adequate and timely state court review is not available. The particular permits before this court are not being challenged in any other venue. As mentioned, there is no citizen suit provision in the West Virginia Water Pollution Control Act. If Plaintiffs' allegations are correct, then any state administrative review was made impossible (or at least improbable) by the DEP's lack of public notice.

-18-

Second, as described previously, Plaintiffs' complaint is better characterized as a traditional citizen-suit enforcement action than a collateral attack on permitting decisions. The opposite finding was clearly a key component of the Fourth Circuit Court of Appeals decision in *Palumbo*. The structure of the CWA (and other environmental statutes) should be read to prevent a citizen suit action that attacks a permitting decision. The CWA provides a mechanism, distinct from the citizen suit provision, to challenge permitting decisions by the administrator. *See* 33 U.S.C. § 1369. When the challenge is not to a permitting decision but a violation of an effluent limitation, a citizen-suit in federal court is the proper avenue for relief.

Third, a decision by this Court will not substantially interfere with state decision-making. Plaintiffs challenge Defendants' discharge of pollutants based on current permit limitations. To determine the applicable limitations, the Court must decide the effect that attempted modifications have on the underlying permit. The Court need not determine how best to regulate selenium, or what limits should be in place for discharge of the pollutant. Neither is the Court asked to determine whether an extension of discharge limits for selenium is wise or appropriate. The Court must simply decide whether the DEP complied with the law when it attempted to extend the deadlines for selenium. If the Court decides for Plaintiffs on the merits, nothing precludes the DEP from making identical modifications in compliance with the appropriate administrative procedure. Because a decision in this case will not "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," the second prong of the *NOPSI* test has not been met. *NOPSI*,  491 U.S. at 361.

-19-

5.  The Primary Jurisdiction Doctrine is Not Applicable

As explained by the U.S. Supreme Court, "[t]he doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *U.S. v. W. Pac. R. Co*, 352 U.S. 59, 63 (1956). The primary jurisdiction doctrine allows an agency to resolve an issue without judicial interference when those issues "have been placed within the special competence of an administrative body." *Id.* at 64. "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of *fact* not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996) (emphasis added).

This case raises no issues that have been vested  specifically to an administrative body. Plaintiffs challenge is better characterized as a traditional citizen suit – within the jurisdiction of a federal court –  than a collateral attack on agency permit decisions – better left to administrative processes.  The disagreements between the parties pertain not to issues of fact, but rather to issues of law.  The Court is confident in its ability to fairly and adequately settle the dispute.

> 6.   Plaintiffs Are Not Collaterally Estopped From Alleging That The DEP's Attempted Permit Modifications were Ineffective

In Defendants' original Memorandum in Support of Their Motion to Dismiss, they raised the issue of collateral estoppel, arguing that Plaintiffs were taking a different position in this case than in their challenge before the EQB.  Defendants argued that Plaintiffs complained to EQB that permit modifications are effective but impermissible, while their district court claims depend upon the modifications being ineffective.  To support this argument, Defendants point to a section of the Facts and Grounds for Appeal before the EQB, which states that the modifications "excus[e] the permitees from compliance with selenium effluent limitations." Defs.' Mem. in Support Ex E.   In their

response, Plaintiffs argued that their positions before the EQB and this Court are identical. Considered in context, it is clear that the statement identified by Defendants simply refers to the DEP's motive in attempting to modify the permits, not Plaintiffs' stance regarding the validity of the modifications.  The relevant passage states, "WVDEP issued the challenged compliance orders to <u>excuse the permittees from compliance with selenium effluent limitations</u> until the agency attempts able [*sic*] to promulgate a different water quality standard for selenium."  Defs.' Mem. of Support Exh. E (emphasis added).  Elsewhere in the same document, Plaintiffs made clear that the modifications are "ineffective to modify the permits at issue because of procedural and substantive defects in the compliance orders."  *Id.*

A necessary requirement for collateral estoppel is that "[t]he party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding."  *King v. Herbert J. Thomas Mem'l Hosp.* 159 F.3d 192, 196 (4th Cir. 1998).  Here, there is no discrepancy in the factual positions taken by Plaintiffs.  Estoppel is not applicable.

### B.  Plaintiff's Claims Under the Surface Mining Reclamation and Control Act of 1977

SMCRA was enacted to "strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements."  *Bragg* 248 F.3d at 288 (citing 30 U.S.C. § 1202(a), (d) and (f)).  To achieve these goals, SMCRA relies on "a program of cooperative federalism that allows States, within limit established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs."  *Molinary v. Powell Mountain Coal Co.,*

*Inc.,* 125 F.3d 231, 234 (1997) (citing *Hodel v. Va. Surface Min. & Reclam. Ass'n,* 452 U.S. 264, 289 (1981)).

Under 30 U.S.C. § 1253(a), a state may "assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations." *See also, Bragg,* 248 F.3d at 288-89; *Molinary*, 125 F.3d at 234. This exclusive state regulatory authority is commonly referred to "primacy." *See Bragg,* 248 F.3d at 289. In order to achieve primacy, a state must develop a program that adheres to the minimum national standards and demonstrate that it has the capability to enforce its own law. *Bragg* 248 F.3d at 288; *Molinary* 125 F.3d 234. If a state fails to submit a program or if the program submitted is unsatisfactory, the federal government will promulgate and administer a regulatory program for that state, pursuant to SMCRA. *Bragg*, 248 F.3d at 288-89; *Molinary,* 125 F.3d at 234. In a scenario where a state has achieved primacy, there are procedures by which the federal government can revoke the state's jurisdiction if the program fails to adhere to minimum federal standards. *See Bragg,* 248 F.3d at 295 (citing 30 U.S.C. §§ 1253, 1254, 1267, 1271).

West Virginia was granted primacy in 1981 after developing a suitable regulatory program. *Id.* at 289. As part of its program West Virginia enacted a state statute, the Surface Coal Mining and Reclamation Act (WVSMCRA). *Id.* WVSMCRA closely parallels the provisions of the federal statute. Similarly, many W. Va. regulations passed pursuant to WVSMCRA closely track federal regulations passed pursuant to the federal SMCRA. Plaintiffs' complaint alleges violations of performance standards contained within both state and federal regulations. First, because applicable regulations incorporate effluent limitations and water quality standards,[5] violations of effluent

---

[5]State regulations also contain a general provision that the permittee must comply with all applicable performance standards. 38 C.S.R. § 2-3.33.c.

standards, contained within in a permit, or water quality standards are violations of SMCRA and

WVSMCRA.  Second, both state and federal regulations require mining activities to be conducted

a manner to "prevent material damage to the hydrologic balance outside the permit area."  30 C.F.R.

§§ 816.41(a) and 817.41(a); 38 C.S.R. § 2-14.5.

The parties hotly contest the role of federal courts in a state such as West Virginia, which has

been granted primacy.  Plaintiffs assert that this court has jurisdiction under 30 U.S.C. § 1270(a),

which provides in relevant part,

> any person having an interest which is or may be
> adversely affected may commence a civil action . . .
> against any [] person who is alleged to be in violation
> of any rule, regulation, order or permit issued pursuant
> to this subchapter . . . . The district courts shall have
> jurisdiction, without regard to the amount in
> controversy or the citizenship of the parties.

Defendants argue that under the *Bragg* court's rationale of exclusive regulatory jurisdiction, the

citizen suit provision contained within the federal SMCRA is not operable in West Virginia.

Based on the applicable precedent, this Court disagrees with Defendants.  Despite *Bragg's*

strong emphasis on the exclusivity of state regulation, the opinion recognized that 30 U.S.C. § 1270

granted federal jurisdiction over some claims.  *Bragg,* 248 F.3d at 299 (citing *Molinary* 125 F.3d at

235-37).  The type of claim *Bragg* held was not subject to federal jurisdiction was a claim against the

administrator of a state program that had been granted primacy pursuant to SMCRA.  *Id.* at 298.  The

claim brought by Plaintiffs is not of this type.

In *Molinary,* decided four years before *Bragg,* the plaintiffs sued for damages in federal court

under 30 U.S.C. § 1270(f), which provides in relevant part,

> Any person who is injured in his person or property
> through the violation by any operator of any rule,

-24-

> regulation, order, or permit issued pursuant to this chapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district in which the surface coal mining operation complained of is located.

They complained that the defendant coal operator had not complied with state regulations, Virginia Regulations §§ 480-03-19.778.13(e) and 480-03-19.778.15(b), passed pursuant to Virginia's version of SMCRA. This non-compliance proximately caused the improper issuance of a Virginia state permit which resulted in mining on their land without their consent. The court in *Molinary* defined the issue as "whether the Virginia regulations allegedly violated by Powell Mountain were issued pursuant to SMCRA," so as to fall within the jurisdiction granted by 30 U.S.C. § 1270(f). 125 F.3d at 235. It concluded that they were. *Id.* at 236.

The *Molinary* panel recognized that under 30 U.S.C. § 1253(a), "exclusive regulatory jurisdiction" was granted to the states "over the regulation of surface coal mining and reclamation operations." *Id.* at 236. They nonetheless held, "[e]xclusive regulatory jurisdiction simply does not encompass exclusive adjudicatory jurisdiction. Common sense dictates that a government's acts in regulating a subject are distinctly different than its acts in adjudicating a party's rights related to the subject." *Id.* In a footnote, the *Molinary* panel rejected the reasoning of the Third Circuit Court of Appeals which came to an opposite resolution of this issue in *Haydo v. Amerikohl Mining, Inc.* 830 F.2d 494 (3d Cir. 1987). *Id.* at n. 5 ("As the district court in the present case correctly recognized, the holding in *Haydo* ignores the fact that the word 'exclusive' in § 503(a) [30 U.S.C. § 1253(a)] modifies the phrase 'regulatory jurisdiction,' and nothing more.")

The holding in *Molinary* was bolstered by the text, structure and policy behind SMCRA. The court considered, for example, the interaction of various provisions of SMCRA. They noted the

-25-

provision contained in 30 U.S.C. § 1270(b)(1)(B) demonstrated that Congress anticipated citizen suit actions in federal court within primacy states. *Id.* at 236. Indeed, it appears 30 U.S.C. § 1270(b)(1)(B) would be rendered superfluous if federal jurisdiction over citizen suits was not allowed in primacy states. The provision prohibits a citizen suit in federal court if the state "has commenced and is diligently prosecuting a civil action . . . to require compliance." 30 U.S.C. § 1270(b)(1)(B). Because a state is only able to prosecute such an action if it has primacy status, the prohibition is only effective in a primacy state. If the grant of primacy eliminated federal jurisdiction over citizen suits, this prohibition would be rendered meaningless.

*Bragg* was brought by different plaintiffs in a different context. There, a panel of the Fourth Circuit Court of Appeals considered a direct challenge to the Director of the West Virginia Division of Environmental Protection, alleging a pattern and practice of violating non-discretionary duties under SMCRA. The *Bragg* panel reasoned that SMCRA established a system of cooperative federalism wherein, once a state was granted primacy, federal regulatory authority and federal regulations dropped into the background. *Bragg*, 248 F.3d at 289, 293-96. Because state law and not federal law was directly operable, the suit was characterized as an attack on a state director for violation of state laws. *Id.* at 295-96. The court then held that the 11th Amendment to the United States Constitution precluded federal jurisdiction over the case. *Id.*

In its description of SMCRA's scheme of federalism, the *Bragg* panel made a number of statements on the exclusivity of state regulatory jurisdiction that can be read to imply that nearly every provision of federal SMCRA dropped out of operation once a state received primacy. *See e.g. id.* at 289 ("Only if an approved State program is revoked, as provided in [30 U.S.C.] § 1271, however, does the federal program become the operative regulation for surface coal mining in any

State that has previously had its program approved.") These statements are the likely source of dicta appearing in later opinions that *Bragg* appears to overrule *Molinary*.[6]

Any contention that *Bragg* overrules *Molinary* is, however, unsound for two principal reasons. First, as both *Bragg* and *Molinary* were panel decisions, the *Bragg* court did not have the authority to overrule *Molinary*. *See McMellon v. U.S.* 387 F.3d 329, 332 (4th Cir. 2004) (en banc). If there were a conflict between *Molinary* and *Bragg,* the holding of *Molinary* would control as that panel considered the issue first. *Id.* at 332-33. ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court.") Second, a close examination of *Bragg* reveals that it is reconcilable with *Molinary*.

Even an expansive reading of *Bragg* must recognize that the panel did not hold that all provisions of the federal SMCRA become inoperable when a state is granted primacy. Most explicitly, the panel made clear that the Secretary of the Interior could take direct advantage of 30 U.S.C. § 1271 to revoke a state's primacy status. *Bragg,* 248 F.3d at 289. In a separate part of the opinion, the *Bragg* panel also wrote, "[i]t is now settled that 30 U.S.C. § 1270 confers on federal district courts subject matter jurisdiction over at least some sorts of claims." *Bragg* 248 F.3d at 299 (citing *Molinary* 125 F.3d at 235-37). Thus, the *Bragg* court recognized that under the holding in

_____

[6]One of these statements appeared in a footnote to a case presided over by Chief Judge Haden, the same district court judge who had been overruled by the panel decision in *Bragg*. *See W. Va. Highlands Conservancy v. Norton*, 147 F.Supp.2d 474, n.4 (S.D. W.Va. 2001). Another appears in a decision by the Third Circuit Court of Appeals, a Circuit with precedent that had been considered and rejected by the Fourth Circuit Court of Appeals decision in *Molinary*. *See Penn. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, n. 7 (3d. Cir. 2002).

-27-

*Molinary*, 30 U.S.C. § 1270, too, was directly operable – in order to grant federal jurisdiction over citizen suit claims.[7]

Section 1270 itself recognizes some limitation to the types of citizen suit claims that may be brought in federal court.  It provides, "any person having an interest which is or may be adversely affected may commence a civil action . . . (2) against the Secretary of the appropriate State regulatory authority *to the extent permitted by the eleventh amendment to the Constitution*."  33 U.S.C. § 1270(a) (emphasis added); *see also Bragg*, 248 F.3d at 290.  *Bragg* addressed this limitation, holding that a citizen suit cannot be brought against a state administrator in a primacy state because doing so is a violation of the 11th Amendment.  *Bragg*, 248 F.3d at 296.  What *Bragg* did not do, and could not do, was disturb the clear holding of *Molinary* that distinguished between regulatory and adjudicatory jurisdiction.  The *Bragg* panel did not hold that federal courts had no jurisdiction in a primacy state, only that the jurisdiction conferred by § 1270 was necessarily limited by the 11th Amendment to the Constitution.

The case before this Court is an enforcement action by a citizen-plaintiff against an operator alleged to be in violation of state regulations and federal regulations passed pursuant to SMCRA.  The 11th Amendment is not implicated as neither the state itself nor a state administrator has been named as a party.  The suit is brought under one of the provisions of the federal SMCRA recognized

---

[7]Defendants argue that *Molinary* is distinguishable because it dealt with a citizen suit under 30 U.S.C. § 1270(f) while the present action is brought under 30 U.S.C. § 1270(a).  There is, however, no difference in statutory language that would compel this result.  The similarity of language in the two subsections was an observation of the *Molinary* court.  *Molinary* 125 F.3d at 236.  ("Considering that the key language in § 520(a)(1) of SMCRA [30 U.S.C. § 1270(a)(1)] is virtually identical to the key language in § 520(f) of SMCRA [30 U.S.C. § 1270(f)], it follows that Congress intended § 520(f) [30 U.S.C. § 1270(f)] to provide for citizen suits for damages in primacy states.")

by both *Bragg* and *Molinary* as directly operable, even in a primary state.  Although *Bragg* precludes Plaintiffs from brining a claim based upon the violations of federal regulations – which are not directly operable in a primacy state – Plaintiffs must be allowed to pursue their claim based on violations of state regulations passed pursuant to SMCRA.  Defendants' motion to dismiss on grounds that there is no cause of action under federal SMCRA must be **DENIED**.

## II.  Defendant's Supplemental Motion to Dismiss Lack of Subject Matter Jurisdiction

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure raises the fundamental question of whether a court is competent to adjudicate the claims brought before it. It is axiomatic that a court must have subject matter jurisdiction over a controversy before it can render any decision on the merits.   Generally, challenges to jurisdiction  under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks."  *Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir.1986), *rejected on other grounds*, *Sheridan v. United States*, 487 U.S. 392 (1988).  A "facial attack" questions whether the allegations in the complaint are sufficient to sustain the court's jurisdiction. *Id*.  If a "facial attack" is made, the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction. *Id*.

On the other hand, a "factual attack" challenges the truthfulness of the factual allegations in the complaint upon which subject matter jurisdiction is based.  In this situation, a "district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."[8]  *Richmond,*

---

[8]*Compare Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (holding that if a motion implicates the merits of a cause of action, the district court should find jurisdiction exists and treat the objection as a direct attack on the merits of the plaintiff's case). *See also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982) (recognizing that "in those cases
(continued...)

-29-

*Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987)).  To prevent dismissal, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.* (citations omitted).  A dismissal should only be granted in those instances in which "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citations omitted).[9]

When a statute is jurisdictional in nature, a district court is required to determine whether the applicable facts bring it within the boundaries of the statute.  *See Thigpen,* 800 F.2d at 396.  Here, the CWA provides jurisdiction for a citizen-suit,

> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

---

[8](...continued)
where the jurisdictional facts are intertwined with the facts central to the merits of the dispute[,] [i]t is the better view that . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits." (citations omitted)).

[9]Defendants did not clearly state that their supplemental motion to dismiss was brought pursuant to Federal Rules of Civil Procedure 12(b)(1).  It is also possible that the supplement could be considered under the standards of a 12(b)(6) motion to dismiss for failure to state a claim for which relief can be granted.  The Court would however still have to deny the motion under the standard of 12(b)(6) because Plaintiffs' complaint raises a right to relief beyond the speculative level.

33 U.S.C. § 1365(a).

In *Gwaltney of Smithfield, LTD v. Chesapeake Bay Found., Inc.*, the Supreme Court looked carefully at the jurisdictional requirements of 33 U.S.C. § 1365(a).  484 U.S. 49 (1987).  In the first part of its opinion, the Court held that there was no jurisdiction when the complaint alleged "wholly past violations."  *Id.* at 56-64.  The second part of the opinion, however, was clear that the provision "confers jurisdiction over citizens suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation."  *Id.* at 64.  The grant of jurisdiction for good-faith allegations "reflects a conscious sensitivity to the practical difficulties of detecting and proving . . . violations of environmental standards."  *Id.* at 65.

Realizing that jurisdiction based on allegations was atypical, the Court emphasized two ways a case could be terminated for lack of jurisdiction.  First, "Rule 11 of the Federal Rules of Civil Procedure, which requires pleadings to be based on a good-faith belief, formed after reasonable inquiry, that they are 'well grounded in fact,' adequately protects defendants from frivolous allegations."  *Id.*  Second, the mootness doctrine could be used later in the course of litigation if it became clear that alleged jurisdictional facts were untrue.  *Id.* at 66.

Here, Defendants do not claim that Plaintiffs' allegations of ongoing violations were not made in good faith.  *See* Mot. Hr'g Tr. 17, Jan. 7, 2007.  The information upon which Defendants base their motion was uncovered well into the discovery process and unknown to both parties until recently. In their response to Defendants' supplemental motion to dismiss, Plaintiffs raise an issue of fact that they wish to further pursue in the course of discovery – whether the "minor modification" used to delete outfalls 1 and 2 from Hobet's permit WV1017225 was effective.   Under the precedent of

*Gwaltney,* this is enough to allow Plaintiffs to avoid a motion to dismiss under Rule 12(b)(1) of the federal rules of Civil Procedure.

Defendants have argued in the alternative, Plaintiffs' claims against Hobet are barred under 33 U.S.C. § 1365(a)(2) because they are subject to an enforcement action by the DEP in Boone County. Again, because it is unclear whether the DEP's minor modification was effective to transfer the applicable outfalls, this Court must retain jurisdiction at present.

Defendants' supplement to their motion to dismiss, requesting dismissal for lack of subject matter jurisdiction, is **DENIED without prejudice.** Defendants will not be precluded from raising the lack of factual basis for jurisdiction in later motions.

### Conclusion

For the reasons given, Defendants' Motion to Dismiss (Doc. 24) is **DENIED**, and their Supplemental Motion to Dismiss (Doc 38) is **DENIED without prejudice**. The defendants will be allowed to reassert arguments concerning lack of subject matter jurisdiction under the CWA and SMCRA if it becomes clear during discovery that the jurisdictional facts in Plaintiffs' complaint are untrue. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:          January 24, 2008

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE