IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST
VIRGINIA HIGHLANDS
CONSERVANCY, INC.,

          Plaintiffs,

v.                                  CIVIL ACTION NO. 3:07-0413

APOGEE COAL COMPANY, LLC, and
HOBET MINING, LLC,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before this Court are the parties' cross-motions for summary judgment (Docs. 56 and 59). For the reasons explained below, Plaintiffs' cross-motion is **GRANTED in part and DENIED in part**. Defendants' cross-motion is also **GRANTED in part and DENIED in part**. Also pending is Plaintiffs' Motion for Leave to File Supplemental Exhibit to Their Cross Motion for Partial Summary Judgment and Declaratory and Injunctive Relief (Doc. 68). This motion is **GRANTED.**

**Background**

This suit revolves around the discharge of selenium from two mining operations in southern West Virginia. Each of the two defendants, Apogee Coal Company, LLC ("Apogee") and Hobet Mining, LLC ("Hobet"), hold permits which regulate their respective discharges of selenium. Plaintiffs contend that each defendant has violated the conditions under which it may discharge selenium into waterways adjacent to its mining operations. Specifically, Plaintiffs are concerned

with Apogee's discharge of selenium into the Rum Creek watershed and Hobet's discharge of selenium into the Mud River watershed.[1]

Selenium occurs naturally in the environment, but is harmful when present in high concentrations. It can, for example, impact aquatic species' ability to reproduce. It may also affect the development of aquatic organisms and in sufficiently high concentrations damage gills and other organs. Mining operations may contribute to elevated selenium levels in the aquatic environment by exposing selenium-bearing earth materials to weathering processes. Defendants do not dispute that high selenium concentrations may have such negative effects on aquatic life, or that mining may contribute to increased levels of selenium. Defendants do contend, however, that they are complying with efforts of the West Virginia Department of Environmental Protection ("DEP") to regulate the amount and concentration of selenium in the state's waters.

## I.     Regulatory Structure

Plaintiffs' allegations are based upon the violations of state and federal versions of the Clean Water Act ("CWA") and the Surface Mining Control and Reclamation Act ("SMCRA"). Because the claims are based on the interaction of various provisions of these statutes, an introduction into their relevant structures is helpful.

At the heart of the CWA lies 33 U.S.C. § 1311, which generally prohibits the "discharge of any pollutant by any person." The primary exception to this prohibition is the National Pollutant Discharge Elimination System ("NPDES"), found within 33 U.S.C. § 1342. Under NPDES, the U.S. Environmental Protection Agency ("EPA") or authorized state agency can issue a permit for the

---

[1] A watershed is the portion of land drained by a particular watercourse. For example, all water that falls as rain or flows in streams within the Buffalo Creek watershed will eventually end up in Buffalo Creek.

discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. Essentially, the NPDES program was created to transform generally applicable provisions of the CWA into specific obligations of the individual pollutant discharger. *Envtl. Prot. Agency v. California ex rel. State Water Res. Control Bd.* 426 U.S. 200, 205 (1976). In creating the NPDES permit, the issuing authority must take account of two central concepts: 1) "effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and 2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet water quality standards." *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Md.* 268 F.3d 255, 265 (4th Cir. 2001).

Both the DEP and the EPA have recognized the potentially harmful effects of selenium for some time. EPA promulgated the first water quality criterion for selenium in 1987– 5 micrograms per liter of water (5 µg/l) – a criterion subsequently adopted by DEP. It was not, however, until a draft Programmatic Environmental Impact Statement on the effects of mountaintop removal, published in 2003, that it became clear selenium discharges from surface mines had the potential to violate the applicable water quality standard. With such information, the DEP was forced to consider the selenium water quality standard when it issued NPDES permits to mine operators and to include water quality based effluent limits in those permits.

Coal mines are also subject to regulation under SMCRA and the West Virginia Surface Coal Mining and Reclamation Act ("WVSMCRA"). Three regulations passed pursuant to WVSMCRA are particularly relevant to the present suit. First, is a condition that mining be conducted in such a manner so as to "prevent material damage to the hydrologic balance outside the permit area." W.Va. Code R. § 38-2-14.5 Second, is a prohibition that mining discharges "shall not violate

effluent limitations or cause a violation of applicable water quality standards." *Id.* at § 38-1-14.5b. Finally, is a provision which incorporates applicable performance standards as a condition of all mining permits. *Id.* at § 38-2-3.33c. Plaintiffs argue that the Defendants' discharge of selenium violates each of these provisions.

Both the CWA and SMCRA operate under systems of "cooperative federalism" between state and federal governments – mechanisms of cooperation, however, vary. Under the CWA, a state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342. West Virginia has received such approval and its NPDES program is administered through the DEP. The Supreme Court has noted that "the [CWA's] regulations effectively incorporate State law into the unitary federal enforcement scheme." *Arkansas v. Oklahoma*, 503 U.S. 91, 109 (1992); *Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 293 (4th Cir. 2001); *see also* 40 C.F.R. 123.25. The scheme under SMCRA is somewhat different, exhibiting greater deference to the states. *See Bragg*, 248 F.3d. at 293. Once a state receives "primacy" to administer its own program under 30 U.S.C § 1253, federal standards effectively "drop out" in favor of the state regulations, which then become the operative law. *Id.* at 295. As both the *Bragg* panel and this Court recognized, however, not all provisions of SMCRA "drop out." *Id.; Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co.,* 531 F.Supp.2d 747, 760-64 (S.D. W.Va. 2008) (denying Defendants' motion to dismiss). Although federal law is not directly enforceable, a cause of action exists to pursue certain violations of state law in federal court. *Ohio Valley Envtl. Coalition, Inc.* 531 F.Supp2d at 760-64. West Virginia has been granted primacy under SMCRA and administers its state program ("WVSMCRA") through the DEP.

**II.     Apogee's Permits**

Apogee conducts surface coal mining in Logan County, West Virginia. Relevant to the present action are operations it conducts on a broad ridge separating the Rum Creek watershed from the Buffalo creek watershed. Two NPDES permits cover the drainage from these operations – WV 0099250 and WV1013599. Permit WV 1013599 is before the Court.

On August 8, 2006 the DEP issued a renewal of permit WV1013599 to the predecessor of Apogee Coal; this permit was transferred to Apogee on September 12, 2006. Permit WV1013599 contained immediately effective limits on the amount of selenium the holder could discharge. Apogee's monthly average discharge was limited to 4.7 µg/l, and the daily maximum discharge to 8.2 µg/l. Discharge Monitoring Reports ("DMRs") submitted by Apogee to the DEP show ongoing violations of these limits. Apogee does not deny that it has exceeded these limits, nor does it challenge the validity of the DMRs. Rather, Apogee relies on a subsequent compliance order which it contends make these limits inapplicable to the present lawsuit.

Apogee contends that the selenium limits in the August 2006 permit were placed there in error. Affidavits from DEP employees support this characterization. According to DEP staff, it was DEP policy to grant permit holders three years to simply "monitor and report" the amount of selenium in their discharges without being subject to final effective limits. Apogee was not granted this grace period in permit WV1013599. DEP issued a compliance order on January 31, 2007 to modify the permit by deleting the effluent limit and imposing monitor and report only requirements.

Despite the fact that both the draft and final versions of permit WV1013599 contained immediately effective selenium limits, however, no one at either the company or the agency seems to have noticed this "mistake" for some time. During a May 20, 2008 hearing, Defendants' counsel

acknowledged that a draft permit was released sometime prior to the August 2006 final permit with the same effluent limits. (There is no indication that Apogee objected to these limits in the draft permit or challenged the final permit through the appeals process.) In the fall of 2006, Apogee contacted DEP and informed the agency that it was in violation of its permit limits for selenium. To bring Apogee into compliance, DEP issued the compliance order on January 31, 2007, which suspended final effective selenium limits for a period of three years and replaced them with monitor and report only requirements. It is undisputed that this compliance order was meant to be immediately effective and was issued without regard for public notification procedure.

Apogee's liability depends upon the invalidity of the January 31st compliance order. If, as Plaintiffs advocate, the order was ineffective to modify the underlying permit, then Apogee has been in violation of applicable permit limits numerous times since August 2006. These violations subject it to liability under both the CWA and SMCRA. If, however, the January 31st compliance order was effective to modify the permit, then Apogee escapes liability. Apogee would not be in violation of its permit conditions at present and, under the precedent of *Gwaltney of Smithfield, Ltd v. Chesapeake Bay Found.*, 484 U.S. 49 (1987), Plaintiffs cannot bring suit for violations of a permit which are "wholly past."

### III. Hobet's Permits

On January 20, 2004, DEP issued a renewal of permit WV1017225 to the predecessor of Defendant Hobet Mining Co. Permit WV1017225 targeted discharges into various tributaries to the Mud River. That renewal contained monitor and report only requirements regarding selenium for the term of the permit or until January 20, 2007. On January 21, 2007, final effluent limitations were

to become effective for two of the outlets covered by the permit – outlets 1 and 2. Two other outlets covered by the permit – outlets 3 and 4 – retained their monitor and report only obligations.

On April 5, 2007, DEP issued a compliance order to Hobet which sought to reinstate monitor and report only requirements for outlets 1 and 2. The validity of this compliance order was one issue that had been raised in this case. It has now become apparent, however, that outlets 1 and 2 were lawfully deleted from permit WV1017225 and incorporated into another permit – WV1020889. Unlike permit WV1017225, permit WV1020889 is currently the subject of a DEP enforcement action and, consequently, outside the jurisdiction of this court.[2] Because no outlet subject to final selenium effluent limitations remains on permit WV1017225, Plaintiffs are no longer pursuing claims under the CWA against Hobet. Plaintiffs, however, are still pursuing their claims under the WVSMCRA based on discharges from the outlet 4 of permit WV1017225. Hobet admits that it has discharged selenium from outlet 4 in excess of the water quality standard – 5µg/l – but denies that these discharges are in violation of the West Virginia SMCRA. It points out that discharges from outlet 4 are small in volume and infrequent.

**Standard of Review**

Rule 56 provides, that summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movement is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

---

[2]More accurately, permit WV1020889 is arguably outside of the jurisdiction of this Court and the subject of a separate lawsuit. In case no. 3:08-cv-88 the same Plaintiffs from this case allege that the DEP is not diligently prosecuting its enforcement action against Hobet. If Plaintiffs succeed in their argument, the Court may in fact have jurisdiction over their citizen suit against Hobet for violations of permit WV1020889. Suffice to say, alleged violations of permit WV1020889 will not be considered in the present action.

The Fourth Circuit Court of Appeals has held that under Rule 56 "it is not enough for the district court to determine that the moving party has the winning legal argument; in accepting that argument, the district court must also ensure that there is no genuine issue as to any material fact before a grant of summary judgment is proper." *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby Inc.* 477 U.S. 242, 248 (1986) (other citations omitted). When cross-motions for summary judgment are filed, "the fact that both parties simultaneously are arguing that there is no genuine issue of material fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *Id.* (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (2d ed. 2983).

## Discussion

The Court will first discuss Plaintiffs' claims against Apogee. The second part of the opinion will address Plaintiffs' claims against Hobet. Apogee previously alleged that Plaintiffs lacked standing to bring suit against them. In a prior Order (Doc. 67), this Court concluded that Plaintiffs satisfied the necessary standing requirements.

**I.   The DEP's January 31, 2007 Compliance Order Was Procedurally Defective and, Thus, Ineffective to Modify the Underlying Permit.**

   *A.   Apogee is Liable for Violations of Permit WV1013599*

In their briefs in support of and opposition to Defendants' earlier motion to dismiss, the parties offered two distinct characterizations of the present case. Defendants argued Plaintiffs' complaint constituted an impermissible collateral attack on a DEP permitting decision (the January 31, 2007 compliance order). Plaintiffs argued that they were pursuing a traditional citizen suit enforcement action and that their claims were unaffected by the January 31st compliance order. The Court agreed with Plaintiffs' characterization and held that, if flawed, the January 31st compliance

order would not serve as a bar to Plaintiffs' claims. *Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co., LLC,* 532 F.Supp.2d 747 (S.D. W.Va. 2008).

As explained in the previous opinion, at least three circuit courts of appeal, including the Fourth, have held that a modification to a permit will not prevent a citizen suit action on the terms of the underlying permit if that modification does not comport with proper procedure. *Id.* at 754-55; *see also, Proffitt v. Rohm & Haas,* 850 F.2d 1007 (3d Cir. 1988) (holding that a stipulation did not change the terms of a permit because of procedural flaws which eliminated opportunity for public participation); *Citizens for a Better Env't – California v. Union Oil Co. of California*, 83 F.3d 1111 (9th Cir. 1996) (holding that a settlement agreement containing interim permit limits did not change the terms of a previously issued permit – in part due to non-compliance with public notice procedures); *U.S. v. Smithfield Foods,* 191 F.2d 516 (4th Cir. 1999) (holding that orders could not modify the permit because Smithfield "did not follow the procedures required for the modification of a permit, and none of the Board's Special Orders and letters were issued in accordance with the permit modification procedures."). The holding – that if procedurally flawed, modifications cannot change the terms of the underlying permit – is now the law of the case.

Federal and state regulations provide that for a major modification to be effective, a draft permit must be issued and the public must be advised of that draft permit.[3] 40 C.F.R. §§ 122.62, 124.10; W. Va. Code R. §§ 47-30-8.2, 47-30-10.1, 47-30-10.2. Public notice is not merely a formality; it ensures that the public has a meaningful opportunity to participate in the issuance of a

---

[3]To qualify as a "minor modification" and avoid the public notice procedures required for a major modification, changes to a permit must fit within specific enumerated categories. *See* 40 C.F.R. § 122.63; W.Va. Code R. § 47-30-8.2. A change in final effluent limits in an NPDES permit is not among the enumerated lists of minor modifications in either the federal or state regulations.

permit. *See Costle v. Pacific Legal Found.*, 445 U.S. 198, 203-04 (1980) (explaining public participation in the NPDES program). Plaintiffs have submitted evidence that shows DEP did not follow public notification requirements when it issued its January 31st order.

Defendants do not dispute the evidence submitted by Plaintiffs. Instead they raise two alternative arguments: first, that Plaintiffs in this case do not and have not relied on public notice to participate in the permitting process; second, that the January 31st order was not a modification at all but simply the correction of a mistake.

Defendants' first argument essentially reasserts the characterization of this suit as a collateral attack on the January 31st compliance order rather than a traditional citizen suit. Defendants contend that Plaintiffs had an opportunity to challenge the order administratively, although they did not know about the compliance order until months after its issuance. Defendants argue that Plaintiffs have exhibited a trial strategy of pursuing claims in federal court whenever they can and using administrative challenges only when they must.

This argument is easily dealt with. First and foremost, the Court has already rejected the characterization of this suit as a collateral attack on the January 31st compliance order. *Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co., LLC,* 532 F.Supp.2d 747 (S.D. W.Va. 2008). It is unclear how the Plaintiffs would have pursued an administrative challenge to the January 31st order since their knowledge of that order came outside the 30 day period allowed for administrative appeals of permitting decisions. W.Va. Code § 22B-1-7(c). Even assuming that the Plaintiffs could have brought an administrative challenge to the final permit, their lack of notice regarding the issuance of the permit prevented them from participating before DEP's action became final. Lastly, the Plaintiffs

have a clear right to bring challenges for violations of a NPDES permit in federal court even if other remedies might have been available. *See* 33 U.S.C. 1365.

As support for their mistake theory Defendants submitted affidavits from three DEP employees – Ken Politan, of the Mining and Reclamation Program Development Group; Marvin Journall, the permit writer assigned to Apogee's permit WV1013599; and Richard Roy an Environmental Resources Program Manager. Each of these employees averred that the January 31st order was not a modification at all, but rather the correction of a mistake. Defendants explain that Apogee should not have been subject to final effluent limitations for selenium at the time of the 2006 renewal of permit WV1013599. The January 31st compliance order simply corrected the error that resulted in the inclusion of final effluent limitations for selenium. They point out that another Apogee permit (WV0099250) was contemporaneously reissued with the monitor and report period in advance of final effluent limits.

As legal support for their mistake theory, Defendants cite *The Last Best Beef, LLC v. Dudas,* 506 F.3d 333 (4th Cir. 2007). This case revolved around trademarks on the term "The Last Best Place" (a phrase that has become a cherished part of Montana culture). The U.S. Patent and Trademark Office (USPTO) issued a two trademarks on the phrase to a Nevada corporation, The Last Best Beef, LLC, just hours after the President signed a bill into law which statutorily revoked their authority to do so. *Id.* at 336. In finding that the USPTO had authority to cancel the trademark registrations the court stated, "federal agencies, including the UPSTO, have broad authority to correct their prior errors." *Id.* at 340. It continued, "[i]ndeed, when federal agencies take erroneous or unlawful action, courts generally should not stand in the way of the agencies' remediation of their own mistakes." *Id.*

The *Last Best Beef* reasoning is inapplicable here and its holding is off-point. In that case, the Fourth Circuit Court of Appeals found agency authority to cure a legal deficiency. The agency's authority had been restricted by Congress just before the agency took action. When it discovered its lack of authority, it promptly reversed the action. The situation at hand is much different. Any mistake made by the agency was to issue a permit inconsistent not with the law, but with a policy choice. There is no question that DEP had authority to issue a permit with final effective selenium limits to Apogee. There is also no question that DEP has authority to make modifications or corrections to a validly issued permit. Such changes, however, must follow a process consistent with applicable law and regulations.

Under the applicable regulations, modifications of permits may fall into two categories: minor modifications and major modifications. 40 C.F.R. §§ 122.62, 122.63; W. Va. Code R. § 47-30-8.2. Minor modifications do not require public notice but are limited to enumerated actions such as the correction of typographical errors. 40 C.F.R. § 122.63; W.Va. Code R. § 47-30-8.2.c.1. Major modifications encompass more substantial changes but require compliance with public notification procedures. 40 C.F.R. § 122.62; W.Va. Code R. § 47-30-8.2.c.2. As there is no argument or indication that the change undertaken by the DEP through the January 31st compliance order falls within one of the enumerated justifications for a minor modification, the law clearly requires public notice.[4] (As Plaintiffs point out, Apogee itself could also have taken action to change the permit, by filing an appeal within the 30-day period provided by W.Va. Code § 22B-1-7(c). It did not do so.)

---

[4] Notably, one category of major modification in state law is entitled "Correction of Mistakes." W.Va. Code R. § 47-30-8.2.c.2.M. ("Correction of Mistakes. To correct technical mistakes, such as errors in calculation or mistaken interpretations of law made in determining permit conditions.")

The DEP did not comply with applicable procedures to modify Apogee's permit when it issued the January 31st compliance order. The undisputed record requires this finding. Discharge Monitoring Reports, submitted by Plaintiffs and uncontested by Defendants, show clear violations of the terms of Apogees NPDES permit. As such, the Court must find that Apogee's final effluent limits for selenium, set by the August 8, 2006 permit, were never modified. Apogee is liable for any discharge that exceeds or exceeded the terms of WV1013599, unmodified by the January 31st compliance order. Plaintiffs' motion for summary judgment against Apogee is **GRANTED**.

In addition to the procedural defects, Plaintiffs allege substantive defects in the January 31st compliance order. As the order is invalid based on the procedural deficiencies alone, there is no need to analyze arguments pertaining to substantive deficiencies. Similarly, because liability under SMCRA would not result in additional remedies, the Court will refrain from addressing Plaintiffs' arguments regarding Apogee's SMCRA violations. The Court expressly declines to address these remaining claims.

*B. Plaintiffs are Entitled to Injunctive Relief.*

To qualify for injunctive relief a plaintiff must demonstrate the following:

> (1) that it has suffered an irreparable injury; 2) that remedies available at law, such as monetary damages are inadequate to compensate that injury; 3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and 4) that the public interest would not be disserved a permanent injunction.

*Christopher Phelps & Assocs., LLC. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

Here the Plaintiffs have made the requisite showing that they are entitled to injunctive relief. Apogee has been in frequent violation of its permit limits for selenium since August 2006, causing

-13-

irreparable injury to Plaintiffs. Although monetary penalties are sought, much of the harm to the environment is already taking place; legal penalties are inadequate to compensate Plaintiffs for their injury. *See Amoco Prod. Co. v. Vill. of Gambell, Ala.,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable."). In cases concerning environmental damage "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* This case is no exception. Finally, the public will be served by the protection of aquatic resources, as intended by the goals and purpose of the CWA and SMCRA.

Defendants argue that, although the Court has authority to issue an injunction, it should use its discretion and refrain from doing so. Defendants contend that the present case is distinct from traditional NPDES enforcement actions – where a discharger can be ordered to stop industrial processes to end the violation. Because selenium leaches from disturbed earth materials, compliance with effluent limitations requires the implementation of a treatment program; Apogee cannot simply cease operations and end the discharge. Further, Apogee argues that the DEP compliance order effectively renders moot Plaintiffs' injunctive relief. That compliance order provides the following dates in a schedule for compliance with the final effluent standards: 1) submission of a treatment plan by the end of November, 2007; 2) construction of a treatment facility or pilot scale treatment facility by July, 2008; 3) compliance with final effluent limitations by January 2010.

Defendants point to cases such as *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523 (11th Cir. 1996), and *Mississipi River Revival, Inc. v. City of Minneapolis, Minnesota*, 319 F.3d 1013 (8th Cir. 2003) to support the argument that the Court has discretion not to issue an injunction. Both of these cases involved situations in which an entity discharged pollutants – resulting from rainwater runoff –

without appropriate permits. Both also involved situations in which the discharger was unable to obtain a permit due to a problems with the regulatory authority. (In *Hughey,* no regulator was issuing a discharge permit; in *Mississippi River Revival*, delays in the permit approval process led to the noncompliance.) In each case, the appellate courts decided relief was inappropriate, in part, because nothing in their power allowed them to stop the discharges, to keep the rain from falling. In *Hughey*, the appellate court overturned an injunction that had been issued by the district court. The injunction simply provided that the discharger should cease discharges in violation of the CWA. Because nothing in the order explained how the discharger was to comply, the *Hughey* court hold the injunction "lacked specificity" required under Federal Rule of Civil Procedure 65 and was unenforceable.

While the Court recognizes Apogee's inability to prevent rainfall, it must also recognize the limits of its own discretion. After all, "a court sitting in equity cannot ignore the judgment of Congress deliberately expressed in legislation. A district court cannot, for example, override Congress's policy choice, articulated in a statute, as to what behavior should be prohibitted." *U.S. v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("*Oakland Cannabis*"). In *Oakland Cannabis,* the Court held that the judiciary could not create a medical necessity exception to an injunction prohibiting the sale of marijuana where Congress specifically found (by labeling it a Schedule I drug) that marijuana had not currently accepted medical benefits. *Id.*

In passing the CWA, Congress made a clear policy choice in favor of environmental protection. (There is no exception to permit compliance because such compliance is expensive.) While the Court might have discretion not to issue an injunction if it believed civil penalties would be sufficient to bring Apogee in compliance, such is not the case. In response to the first deadline

in the January 31st compliance order – the establishment of a treatment plan – Apogee's senior environmental engineer submitted a letter to DEP stating,

> The Article 3 permit, S-5005-93, associated with WV1013599 was granted Phase I Bond release on October 20, 2006. It is anticipated that Phase III release will be obtained prior to October 2011 which is the submittal date for NPDES reissuance. Due to this reason, the requirement for a treatment plan does not apply for WV1013599.

Plaintiffs' Reply (Doc. 66) Ex. 6. In other words, Apogee has not taken even the initial step towards compliance and has indicated that it has no plans to do so. Apogee's counsel was unaware of any response by DEP. Additionally, this is not a situation comparable to *Hughey* or *Mississippi River Revival* where the discharger was unable to obtain a permit: Apogee holds a NPDES permit and is in clear violation of its terms. Under such circumstances, the Court cannot simply trust that civil penalties will ensure future compliance with the CWA. Some form of injunctive relief is necessary.

An injunction in this case need not lack specificity or be unenforceable. The Court has options besides ordering Apogee to immediately cease discharges or comply with the law. DEP, itself, has set forth a compliance schedule, which includes specific steps that should be taken to bring Apogee into compliance with its final selenium limits. This Order adopts the agency's belief that compliance is feasible.

Plaintiffs' request for injunctive relief requires Apogee to develop a treatment plan within thirty days and implement that plan within ninety additional days. As Apogee, through its own inaction, is nearly six months past the deadline for submission of a treatment plan, the Court can find no reason why the submission of such a plan within the next thirty days is unreasonable. Apogee

-16-

is, therefore, **ORDERED** to submit such a plan within thirty days. This plan shall contain a schedule for implementation; within ninety days or Apogee must show cause of its inability to do so.

## II.     Hobet is Entitled to Summary Judgment Against Plaintiffs.

Plaintiffs acknowledge that they cannot pursue their CWA claims for violations of effluent limits against Hobet. The two outlets regulated under permit WV1017225 that were out of compliance with effluent limits (outlets 1 and 2) were deleted from the permit. The only remaining outlet regulated under the permit (outlet 4) is subject only to monitor and report requirements for selenium. Any violations of effluent limitations are, therefore, "wholly past"and barred under the precedent of *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987).

Plaintiffs have not, however, dropped their claims under WVSMCRA. Plaintiffs argue that provisions of WVSMCRA should be read to preclude discharges which contribute pollutant levels in excess of water quality standards. The first, W. Va. Code R. § 38-2-14.5 provides, "All surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside the permit area . . ." Plaintiffs assert that this provision must be read in combination with the applicable definition of "cumulative impact," which includes a standard for "material damage." This definition of "cumulative impact" includes the following statement: "When the magnitude of cumulative impact exceeds threshold limits or ranges as predetermined by the Division, they constitute material damage." W. Va. Code R. § 38-2-2.37 (1998). In a footnote, Plaintiffs also cite W.Va. Code R. § 38-2-14(b), which provides, "[d]ischarge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards." Finally, Plaintiffs briefly reference W.Va. Code R. § 38-2-3.33.c, which requires a permittee to comply with "all applicable performance standards of the Act."

In response to Plaintiffs' arguments, Defendants point to a decision by the D.C. Circuit Court of Appeals, which held that SMCRA regulations cannot be construed to impose effluent limitations more stringent than those required under the CWA.[5] *In re Surface Mining Regulation Litigation*, 627 F.2d 1346, 1366 (D.C. Cir. 1980). *In re Surface Mining Regulation Litigation* involved numerous challenges to SMCRA regulations. One of these challenges was to interim effluent limitations promulgated by the Secretary of the Interior. For a resolution, the court looked to 30 U.S.C. § 1292(a)(3), which provides, "Nothing in this chapter shall be construed as superseding, amending, modifying or repealing . . . [The CWA]." The court concluded that while effluent limitations could be passed pursuant to SMCRA in order to fill in regulatory gaps not covered by EPA, where "regulation of surface coal mining's hydrologic impact overlaps EPA's, the Act expressly directs that the [CWA] and its regulatory framework are to control. . ." *Id.* at 1367. In other words, SMCRA regulations cannot be construed to impose effluent limitations more stringent than those established under the authority of the CWA. Defendants argue that because they are in compliance with the effluent limitations in their permit, a finding of liability on Plaintiffs' WVSMCRA theory would supersede the CWA and contradict the holding of *In re Surface Mining Regulation Litigation*, 627 F.2d 1346.

Plaintiffs' reply that they are not trying to supersede provisions of the CWA. They argue that regulations passed pursuant to the CWA themselves prohibit discharges that cause a violation of applicable water quality standards. W.Va. Code R. § 47-30-5.1.f ("The discharge or discharges covered by a [NPDES] permit are to be of such quality so as not to cause violation of applicable

---

[5]The D.C. District Court and D.C. Circuit Court of Appeals have exclusive jurisdiction over challenges to regulations passed pursuant to SMCRA.

water quality standards. . ." During a recent hearing Plaintiffs' counsel represented that in his opinion there were CWA violations based on this regulation; Plaintiffs simply could not pursue these CWA violations directly because of procedural bars to their claims.[6]

There is no dispute that Hobet is in compliance with the effluent limitations contained within its permit (the monitor and report only requirements). An important issue thus arises: Can a discharger be held liable for violations of the CWA – even while in compliance with all applicable effluent limitations – if it discharges pollutants to a waterway where instream concentrations of the pollutant exceed water quality standards? If such a discharger cannot be held liable under the CWA, a finding of liability under SMCRA (or WVSMCRA) would impose discharge limits more stringent than those required under the CWA. SMCRA requirements would supersede those of the CWA.

Plaintiffs' theory, thus, implicates core issues of the structure and function of the CWA. Moreover, if accepted, Plaintiffs' theory would have enormous policy implications for CWA regulation and enforcement. Plaintiffs' claims against Hobet, however, are not CWA claims. The issue of whether or not a discharger can be held liable for water quality standards violations even while complying with its NPDES effluent limitations is not directly before the Court, but a finding in Plaintiffs' favor requires an answer to the question. The Court refuses to decide such an important issue in an indirect challenge. Consequently, the Court must find that Plaintiffs' challenge under WVSMCRA threatens to supersede the provisions of the CWA. As it pertains to Hobet, Defendants' motion for summary judgment is **GRANTED**.

---

[6]A citizen-suit enforcement action under the CWA requires potential plaintiffs to provide notice to an alleged violator sixty days prior to filing suit. 33 U.SC. § 1365(b). Plaintiffs' counsel conceded that the notice to sue Hobet did not include this ground.

**Conclusion**

For the reasons explained above, Plaintiffs' motion for partial summary judgment (Doc. 56) is **GRANTED in part and DENIED in part**. Defendants' cross-motion for summary judgment (Doc. 59) is also **GRANTED in part and DENIED in part**. Further, Plaintiffs' Motion for Leave to File Supplemental Exhibit to Their Cross Motion for Partial Summary Judgment and Declaratory and Injunctive Relief (Doc. 68) is **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: May 27, 2008

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE