**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON**

**OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,**

        **Plaintiffs,**

**v.**                              **Civil Action No. 3:07-cv-00413**

**APOGEE COAL COMPANY, LLC,**

        **Defendant.**

**APOGEE COAL COMPANY, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION IN LIMINE TO
EXCLUDE EXPERT TESTIMONY OF BRYCE PAYNE**

Pursuant to Rule 702 of the Federal Rules of Evidence, Defendant Apogee Coal Company, LLC ("Apogee"), by counsel, submits this Memorandum of Law in Support of its Motion to exclude Dr. Bryce Payne's testimony because, despite his self-proclamation, he lacks the credentials necessary to offer opinions on the impacts of Apogee's selenium discharges on fish or other aquatic life.[1]

## INTRODUCTION

Plaintiffs have listed Dr. Bryce Payne as an expert.  In their disclosure of his expected testimony and areas of expertise, Plaintiffs' informal summary provided that he would limit his opinions to the following:

> 1.    The importance of adequate control or reference sites in environmental experimental design, and his opinion of the control or reference in Potesta's data.

---

[1] Dr. Payne was disclosed for the first time at the pretrial hearing on July 27, 2010; his opinions were summarized on July 31, 2010; he was deposed on August 2, 2010; and Apogee received the transcript of his deposition on August 6, 2010.

    2.     The importance of QA/QC in the gathering and evaluation of data in environmental science and his opinion of the QA/QC in Potesta's data.

    3.     The importance of repeatability in experimental design, and his opinion of the repeatability of the Potesta studies.

    4.     His evaluation of Potesta's Length vs. WB Se charts.

Ex. 1 to Bryce Payne deposition (attached to Motion as Ex. 1). In his deposition of August 2, 2010, however, Dr. Payne claimed that he would offer opinions about the impacts of selenium on aquatic life:

    Q.     . . . do you have any opinion, in this case, about the impacts of selenium from the particular mines at issue on aquatic life?

    A.     I have opinions on the selenium impacts on aquatic life in this case. I haven't had evidence in front of me to say with certainty that I know where the selenium is coming from. * * * That's not what I've been asked to look at.

            I've been asked to look at the water quality data, the fish tissue selenium data and so forth and to render an opinion on that data.

Payne dep., p. 7 (relevant portions attached to Motion as part of Ex. 2). While Dr. Payne is a "scientist" of sorts, he is not qualified to render opinions on the impacts of selenium on aquatic life.[2] Accordingly, the expert testimony of Dr. Payne should be excluded.

## LEGAL STANDARD

Under Federal Rule of Evidence 702,[3] trial judges act as gatekeepers to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert v. Merrell*

---

[2] "Back off, man. I'm a scientist." Like Dr. Peter Venkman, played by Bill Murray in the 1984 classic "Ghostbusters," Dr. Payne claims expertise merely by proclaiming himself to be a "scientist."

[3] Federal Rule of Evidence 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993);[4] *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). Expert testimony, in order to be reliable, "must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 590, 592-93) (emphasis in original). Moreover, the burden rests on the "[p]roponent of the testimony [to] establish its admissibility by a preponderance of proof." *Cooper*, 259 F.3d at 199 (quoting *Daubert*, 509 U.S. at 592, n. 10).

In applying Rule 702, district courts "must recognize that due to the difficulty of evaluating [expert] testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 595); *see also Kumbho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (emphasizing that the objective of *Daubert*'s gate-keeping requirement is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). In light of the foregoing, "a trial judge, faced with a proffer of expert scientific testimony, must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Cooper*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert*, 509 U.S. at 592-93).

---

[4]   The Supreme Court in *Daubert* identified several factors that may bear on a judge's determination of the reliability of an expert's testimony.  These factors include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.  *See Daubert*, 509 U.S. at 592-94.  This list, however, is "neither definitive nor exhaustive." *Id.*  Rather, the factors listed "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 200.  The primary goal of this inquiry is to ensure that the proffered testimony is reliable, in the sense that it is based on scientific knowledge, and relevant, in the sense that it will be of assistance to the fact-finder. *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000).

## ARGUMENT

Dr. Payne is a soil scientist—not an aquatic biologist.  His resume as produced by Plaintiffs is attached to Apogee's Motion as Exhibit 3.  It shows that:

- He holds M.S. and Ph.D. degrees from Colorado State in "Soil Science"

- He has worked on the following projects:

  – Evaluation of groundwater quality impacts of ash disposal

  – A start-up biodiesel project

  – Evaluated the use of "biosolids" and ash products  as soil substitutes on mined lands

  – Evaluated soil and turf as part of a tree improvement program for a municipal park

*See* Ex. 3, pp. 1 & 2.  He is not, however, an ichthyologist, aquatic biologist or aquatic ecotoxicologist.  Payne's educational background encompasses chemistry and soil science, but not aquatic biology:

> Q:   Let's go back to your biology.  **What education do you have in aquatic biology?**
>
> A:   **None.**
>
> Q:   **Aquatic ecotoxicology?**
>
> A:   **None.**  I mean I have had to speak to the subject, I've been asked to look into the subject.  Formal education, no."

Payne dep. p. 32 (relevant portions included as part of Ex. 2).  Likewise, he has written no papers on the impacts of selenium on aquatic life.

> Q.   . . . **But have you written any papers on the impacts of selenium on aquatic life?**
>
> A.   **No.**  Communications with other scientists, but no papers, no reports. * * *

Payne dep., p. 149.

Payne's professional career also reveals that he lacks the requisite knowledge, skill, experience, training, or education regarding the impact of selenium on the aquatic ecosystem that would render him an expert on the subject.

> Q:   Have you done any work personally on the accumulation of selenium in sediments in lentic versus lotic environments?
>
> A:   No.

Payne dep., p. 51.

> Q:   . . . **Have you personally done any work assessing the impacts of selenium on aquatic life?**
>
> A:   **No, no, no, period.  No.  The answer is just simply no.**

Payne dep., p. 80.

> "I'm an environmental scientist.  I'm not an etheologist [sic] [ichthyologist] or an aquatic biologist.  When I'm asked to interpret data, it often incorporates multiple fields, I don't get to walk down one track, and you just have to do it."

Payne dep., p. 81.

> Q:   You haven't looked, for example, for a reference area in another location to determine what various species of fish would likely be located in an environment like the Mud River or Rum Creek area, have you?
>
> A:   No.
>
> Q:   Would you consider yourself an expert in that area?
>
> A:   No.
>
> Q:   So you would leave that to others?
>
> A:   Yes.

Payne dep., p. 97.  Rather, Payne is a generalist who, in the area of selenium, has to rely wholly on the opinions of others who <u>are</u> real experts:

> "You don't become an expert in the sense that you can go execute particular procedures that require years of training in that particular field.  <u>You do become expert at the ability to</u>

<u>say, okay, I understand this question and I'm going to go talk to so and so who has answers to that kind of question and I get his answers and I go get the other fellow's answers that have some other aspect, physics, chemistry,</u> whatever it might be. . . .  But that's what environmental scientists have to do.  That's not what etheologists [sic] [ichthyologists] do.  It's not what ecotoxicologists do.   I mean we are the integrators if you want and we have to do it.  It simply requires it.  Otherwise you have these pieces of data and no problem is ever addressed from a broader perspective."

Payne dep.,  p. 99-100.

> Q.      Do you have any personal experience with impacts –
>
> A.      No.
>
> Q.      Let me finish – on birds?
>
> A.      No.
>
> Q.      Selenium impacts on birds?
>
> A.      No, none, period.

Payne dep., p. 148.

> Q.      Have you used any commercial labs for fish tissue sampling yourself?
>
> A.      No. * * *

Payne dep., p. 121.

Indeed, Dr. Payne's investigation into the impacts of selenium on aquatic life is scant.

It consists only of reading the work of others and even that only began less than two years ago:

> Q:      The full question was, when did you first conduct any research into, go looking for, information about the impacts of selenium on fish or other aquatic life.  I think the answer is after the TVA spill.
>
> A:      Right.  Related to the TVA spill, right.
>
> Q:      When did that occur?
>
> A:      December – December 22nd, 2008.
>
> Q:      So about a year and a half ago?

        A:      Yeah.

Payne dep., p. 105.  Furthermore, Payne's knowledge regarding selenium impacts is limited to fish and no other forms of aquatic life.

        Q:      And it was during that time that you first looked indepth at the impacts of selenium on aquatic life?

        A:      Right.  Fish, not on aquatic life, generally just fish.

        Q:      Did there come a time, either before or after you looked indepth at the impact of selenium on aquatic life other than fish?

        A:  No. No.  I've not looked at all, period.

Payne dep., p. 113.

        Finally, Plaintiffs have not designated Payne to testify about the impacts of selenium from the particular mines at issue on aquatic life.[5]  Payne's testimony will not assist the trier of fact because he does not have the specific knowledge necessary to testify as an expert.  Because of this, his testimony is not deemed to be reliable and trustworthy.  Therefore, it should be excluded.

        Respectfully submitted,

        APOGEE COAL COMPANY, LLC
        By Counsel

/s/*Robert G. McLusky*
ROBERT G. McLUSKY (WVSB # 2489)
BLAIR M. GARDNER (WVSB # 8807)
THOMAS J. HURNEY, JR. (WVSB # 1833)
DOUGLAS J. CROUSE (WVSB # 11094)
JACKSON KELLY PLLC
P.O. Box 553
Charleston, WV 25322
*Counsel for Apogee Coal Company, LLC*

---

[5] *See* Ex. 1 to Bryce Payne deposition (attached to Motion as Ex. 1).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON

**OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,**

       **Plaintiffs,**

**v.**                                   **Civil Action No. 3:07-cv-00413**

**APOGEE COAL COMPANY, LLC,**

       **Defendant.**

### CERTIFICATE OF SERVICE

       I, Robert G. McLusky, do hereby certify that on August 11, 2010, I electronically filed the foregoing APOGEE COAL COMPANY, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF BRYCE PAYNE with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

               Derek O. Teaney
               Joseph M. Lovett
               Appalachian Center for the Economy
                 and the Environment
               P.O. Box 507
               Lewisburg, WV  24901

               James M. Hecker
               Public Justice
               1825 K. Street, NW, Suite 200
               Washington, DC  20006

                             /s/*Robert G. McLusky*